IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ONEIDA PLAZA, LLC,       Plaintiff, | : : | CIVIL ACTION No. 20-4485 |
| v. | : : | |
| OHIO SECURITY INSURANCE COMPANY,       Defendant. | : : | |

**January 27, 2022**                                                                                                   **Anita B. Brody, J.**

## MEMORANDUM

### I. INTRODUCTION

More than eight months after a storm caused damage to Plaintiff Oneida Plaza, LLC's ("Oneida Plaza") commercial property in Utica, New York, Oneida Plaza filed an insurance claim with its commercial property insurer, Defendant Ohio Security Insurance Company ("Ohio Security"). Due to the delayed reporting of the claim, Ohio Security denied coverage. Oneida Plaza now brings a breach of contract claim against Ohio Security for the denial of its insurance claim. I exercise diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332. Ohio Security moves for summary judgment. For the below reasons, I will grant Ohio Security's motion for summary judgment.

### II. BACKGROUND[1]

Oneida Plaza is a New York domestic limited liability company that owns a commercial property located at 1651 Oneida Street, Utica, New York 13501 (the "Property"). Def.'s

---

[1] The facts are presented in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

1

Statement of Undisputed Facts ("Def.'s SUF) ¶¶ 6-7. The owners of Oneida Plaza are Chealan Tav, Lilin Tav, Peoumlika Tav, and Oudom Tav. Chealan Tav Dep. 10:17-11:8. All of the owners live in Pennsylvania, with the exception of Chealan Tav who moved from Pennsylvania to New York in 2020. Chelan Tav Dep. 13:1-14:1.

### A. Damage to the Property

On August 13, 2019, the Property suffered water damage as the result of a storm with heavy wind and rain. Def.'s SUF ¶ 10.  During the storm, two owners of Oneida Plaza, Chealan and Lilin Tav, were at the Property. Chealan Tav Dep. 18:3-10; Lilin Tav Dep. 7:20-25, 9:21-23. Chealan Tav watched as the heavy rain and wind damaged the building and noticed that some spots in the roof were leaking. Chealan Tav Dep. 18:6-11. Lilin Tav also noticed that the storm caused leaking from the roof. Lilin Tav Dep. 10:2-10. Additionally, Lilin Tav saw some of the roof come down and observed debris from the roof on the ground. Lilin Tav Dep. 12:6-13:3.

At the time of the storm, Oneida Plaza leased the Property to a commercial tenant, JJ Hart Development Corp., which operated a Save-a-Lot grocery store on the premises. Def.'s SUF ¶ 12. On the date of the storm, someone called 911 to report that the roof of the Save-a-lot was leaking. Gerald Foster Dep. 16:9-23. As a result, on that same day, August 13, 2019, Fire Marshal Gerald Foster went to the Property to inspect it. Foster Dep. 16:19-17:19.

While inside the Save-a-lot, Foster observed wet ceiling tiles in more than one location throughout the Save-a-lot. Foster Dep. 42:22-25; 43:15-19; 45:10-17. He also noticed that ceiling tiles were missing and observed "some tiles on the floor that had dropped from water damage because they were soaked by water." Foster Dep. 86:1-13. He also saw multiple buckets and tarps in the store that were placed there to catch water that was dripping from the roof. Foster Dep. 41:4-42:14; 45:22-46:13. Additionally, Foster saw water dripping down through the fire

alarm. 44:8-45:2. Based on his assessment of the building, that same day, Foster determined that it was unsafe to be occupied because the roof was leaking, which indicated a possible structural deficiency. Foster Dep. 17:16-19; 24:3-25:4.

On August 13, 2019, Foster ordered the power to be shut off and posted two notices on the building that informed the public the structure was unsafe and could not be occupied. Foster Dep. 36:9-25; Reede Decl. Ex. N. One notice ordered that the Save-a-Lot was "NOT TO BE OCCUPIED and that all persons vacate, cease and desist from occupancy and use of the premises." Reede Decl. Ex. N. The other notice stated, "NOTICE! THIS BUILDING IS HEREBY DECLARED **UNSAFE** due to structural deficiencies, Utica Fire Department, by order of Fire Marshal, the building is declared unsafe." Reede Decl. Ex. N.

On the day of the storm, Chealan Tav saw the notice on the Property and learned that the Property could not to be occupied. Chealan Tav Dep. 89:1-9. In addition, someone from the Fire Marshal's office personally informed Chealan Tav that no repair work could be done inside the building until after the roof was replaced. Chealan Tav Dep. 43:19-44:13; Foster Dep. 83:14-16.

After the storm, Oneida Plaza contacted a few companies to find someone to replace the roof. Chealan Tav Dep. 48:11-17. On September 9, 2019, Dennis Padula & Sons sent a proposal for replacement of the roof of the Property to Chelan Tav. Joseph Padula Dep. 6:21-7:23. However, Dennis Padula & Sons did not replace the roof of the Property until April 2020. Chealan Tav Dep. 44:14-17; Padula Dep. 13:14-18. No work was performed to prevent further damage to the interior or exterior of the building during the extended period of time between the storm and when the roof was replaced. Chelan Tav Dep. 43:1-44:22. As a result, the condition of the Property deteriorated, and mold grew inside the building. Chealan Tav Dep. 45:8-11; Reede Decl. Ex. G.

**B. The Insurance Claim**

On April 22, 2020, more than eight months after the storm occurred, Oneida Plaza filed an insurance claim with Ohio Security to cover the expenses of replacing the roof and repairing the interior damage to the Property. Def.'s SUF ¶ 34. Ohio Security is an insurance company organized under the laws of New Hampshire with its principal place of business in Boston, Massachusetts. Def.'s SUF ¶ 9. Ohio Security issued a commercial property insurance policy (the "Policy") to Oneida Plaza to insure the Property for the policy period of March 1, 2019 to March 1, 2020. Def.'s SUF ¶ 40. The Policy lists Oneida Plaza's mailing address as 1651 Oneida Street, Utica, New York 13501. Def.'s SUF ¶ 42. It also lists the mailing address of Oneida Plaza's insurance agent as Coverwallet, Inc., 100 Avenue of the Americas, Third Floor, New York, New York 10013-1689. Def.'s SUF ¶ 43.

In the event of loss or damage, the Policy requires that Oneida Plaza: "Give us prompt notice of the loss or damage."[2] Watson Decl. Ex. A. On May 30, 2020, Ohio Security mailed a denial letter to Oneida Plaza, informing it that "we find no coverage under the terms and conditions of your policy for the costs claimed in connection with your asserted claim and therefore deny your claim." Watson Decl. Ex. H. The letter explained that "[a]s outlined in the policy language . . . the claimed storm damage to the roof and the interior walls and floor damages will not be covered due to the late reporting."[3] Watson Decl. Ex. H.

---

[2] The Policy also lists several other duties of the insured in the event of loss or damage. *See* Watson Decl. Ex. A.

[3] The denial letter also explained that the claim was denied because: "[O]ur rights to an inspection of the damages prior to the repair were prejudiced. The conditions of the policy have not been adhered to regarding 'Duties After a Loss.' We also note that since the property is vacant there would be no coverage for water damage." Watson Decl. Ex. H.

4

Case 2:20-cv-04485-AB Document 18 Filed 01/27/22 Page 5 of 16


**III. STANDARD OF REVIEW**

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "genuine" if the evidence would permit a reasonable jury to return a verdict for the nonmoving party. *Id.* In ruling on a motion for summary judgment, the court must draw all inferences from the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After the moving party has met its initial burden, the nonmoving party must then "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. Both parties must support their factual positions by: "(A) citing to particular parts of materials in the record . . . ; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The materials in the record that parties may rely on include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). In opposing a motion for summary judgment, the nonmoving party may not "rely merely upon bare assertions, conclusory allegations or suspicions." *Fireman's Ins. Co. of Newark, N.J. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982).

The inquiry at summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

## III. DISCUSSION

Ohio Security moves for summary judgment on the basis that the late notice provision in the Policy precludes coverage of Oneida Plaza's claim because it was not filed until more than eight months after the storm that damaged the roof occurred.[4] Oneida Plaza counters that summary judgment should be denied because genuine disputes of material fact exists as to whether the late notice provision precludes coverage. To decide whether summary judgment should be granted, the Court must determine whether New York or Pennsylvania law applies to the late notice provision.

### A. Choice of Law

In a diversity jurisdiction case, a court must apply the choice of law rules of the state in which it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Here, that state is Pennsylvania. Pennsylvania applies the "interests/contacts" methodology to contract choice of law questions. *Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 226-27 (3d Cir. 2007). Under this approach, "Pennsylvania courts are to apply the law of the forum with the 'most interest in the problem.'" *Id.* at 227 (quoting *Griffith v. United Air Lines Inc.*, 203 A.2d 796, 806 (Pa. 1964)).

Pennsylvania's choice of law analysis has three steps. First, a court decides if there is "an *actual* or real conflict between the potentially applicable laws." *Id.* at 230. If there is no conflict

---

[4] Ohio Security also moves for summary judgment on the basis that it does not owe coverage to Oneida Plaza because Oneida Plaza replaced the roof before Ohio Security could inspect the Property, which violated the Policy requirement that Ohio Security had the independent right to inspect the damaged property. Because I will grant Ohio Security's motion for summary judgment on the basis that Oneida Plaza failed to provide timely notice of the claim, it is unnecessary to reach this argument.

and the law in both jurisdictions is the same, then there is no need to proceed with a choice of law analysis. *Id*. Second, if there is a conflict in the law, then a "court should examine the governmental policies underlying each law, and classify the conflict as a 'true,' 'false,' or an 'unprovided-for' situation." *Id*. Third, "[i]f a true conflict exists, the Court must then determine which state has the 'greater interest in the application of its law.'" *Id.* at 231 (quoting *Cipolla v. Shaposka*, 267 A.2d 854, 856 (Pa. 1970)).

### 1. There is an actual conflict between Pennsylvania and New York law

"[T]he first part of the choice of law inquiry is best understood as determining if there is an *actual* or real conflict between the potentially applicable laws." *Id.* at 230. If there is no actual conflict, "a choice of law analysis is unnecessary." *Id*. Here, as both parties agree, there is an actual conflict between Pennsylvania and New York late notice laws. *Id.* at 232.

"Pennsylvania requires an insurer to establish it was prejudiced by an insured's late notice before it can disclaim coverage on those grounds (the 'prejudice rule')." *Id.* at 231 (citing *Brakeman v. Potomac Ins. Co.*, 371 A.2d 193, 198 (Pa. 1977)). "Under New York law, 'absent a valid excuse' for late notice, an insured's 'failure to satisfy the notice requirement vitiates the policy' regardless of whether the insurer can show prejudice (the 'no prejudice rule')." *Id.* at 231-32 (quoting *Sec. Mut. Ins. Co. of New York v. Acker-Fitzsimons Corp.*, 293 N.E.2d 76, 78 (N.Y. 1972)).

### 2. The conflict is true

"If there are relevant differences between the [state] laws, then the court should examine the governmental policies underlying each law, and classify the contract as a 'true,' 'false,' or an 'unprovided-for' situation. *Id.* at 230. "[I]f *both* jurisdictions' interests would be impaired by the application of the other's laws," then there is a true conflict and a "deeper choice of law analysis

7

is necessary." *Id*. (internal quotation marks and alterations omitted). Here, as both parties agree, there is a true conflict because both Pennsylvania and New York have interests that would be impaired by the application of the other's laws. *Id.* at 232.

"Pennsylvania's prejudice rule is designed to safeguard the interests of the *insured and accident victim* by protecting them against forfeitures on technical grounds." *Id.* (citing *Brakeman*, 371 A.2d at 196-98 & n.8). In contrast, "New York's law, by requiring strict compliance with notice provisions, is meant to protect *insurers* from fraud or collusion, and enable them to 'take an active, early role in the litigation process, and in any settlement discussions and to set adequate reserves.'" *Id.* (quoting *Argo Corp. v. Greater N.Y. Mut. Ins. Co.*, 827 N.E.2d 762, 765 (N.Y. 2005)).

### 3. New York has a greater interest in the application of its law

"If a true conflict exists, the Court must then determine which state has the 'greater interest in the application of its law.'" *Id.* at 231 (quoting *Cipolla*, 267 A.2d at 856). This analysis requires "a combination of the 'approaches of both [the] Restatement II (contacts establishing significant relationships) and 'interests analysis' (qualitative appraisal of the relevant States' policies with respect to the controversy).'" *Id.* at 231 (quoting *Melville v. Am. Home Assur. Co.*, 584 F.2d 1306, 1311 (3d Cir. 1978)). The determination of which state has the greater interest "takes into account both the grouping of contacts with the various concerned jurisdictions and the interests and policies that may be validly asserted by each jurisdiction." *Melville*, 584 F.2d at 1311. In this case, New York has a greater interest in the application of its law because New York has the most significant relationships to the insurance contract and the greatest governmental interest in having its laws enforced.

8

First, it is necessary to look at the contacts under the Restatement (Second) of Conflict of Laws and then to look at the governmental interests. *Hammersmith*, 480 F.3d at 232-35. Section 193 of the Restatement (Second) of Conflict of Laws applies to contracts of fire, surety, or casualty insurance. Whereas § 188 of the Restatement (Second) of Conflict of Laws applies generally to contracts in the absence of any choice of law of the parties. An analysis of each state's contacts reveals that New York has a more significant relationship to the Policy under both § 193 and § 188.[5]

Section 193 provides: "The validity of a contract . . . and the rights created thereby are determined by the local law of the state which the parties understood was to be the principal location of the insured risk during the term of the policy, unless . . . some other state has a more significant relationship . . . to the transaction and the parties . . . ." Restatement (Second) of Conflict of Laws § 193. A court should generally give the location of the insured risk "greater weight than any other single contact." *Id.* cmt. b. "The importance of the risk's principal location . . . enjoys greatest significance when an immovable is involved, such as when the risk insured against is damage by fire to a particular building." *Id.*

The Policy at issue is a commercial property insurance policy that provides coverage for the Property, which is located at 1651 Oneida Street, Utica, New York 13501. It is indisputable that the location of the insured risk is New York. Therefore, under § 193, New York has the most significant relationship to the insurance contract.

---

[5] Both parties agree that § 188 is applicable to the greater interest analysis. Ohio Security argues that § 193 is also applicable, whereas Oneida Plaza argues that § 193 is inapplicable because it only applies to casualty insurance and this case involves a commercial property insurance policy. Section 193, however, is also applicable to fire insurance, Restatement (Second) of Conflict of Laws § 193 cmt. a., and "'fire insurance' is more accurately synonymous with property insurance," Albert Hamilton Dib & Albert H. Dib, Forms and Agreements for Architects, Engineers and Contractors § 6.25 (2021). Therefore, § 193 is also applicable. Regardless, even if § 193 were not applicable, New York would still have a more significant relationship to the Policy under § 188.

Section 188 provides that the following contacts should be considered to determine which state has the most significant relationship: "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil[e], residence, nationality, place of incorporation and place of business of the parties."[6] Restatement (Second) of Conflict of Laws § 188(2). When considering notice of a claim, "location of the insured risk is . . . diminished in importance while factors like the location of the injury, the domicile of the parties, and the location of contracting and negotiation become relatively more important." *Compagnie des Bauxites de Guinee v. Argonaut-Midwest Ins. Co.*, 880 F.2d 685, 690 (3d Cir. 1989). In particular, "[t]he place of contracting, negotiation, and performance are the most relevant contacts with respect to the notice procedures." *Id.* (quoting *Sandefer Oil & Gas, Inc. v. AIG Oil Rig of Texas Inc.*, 846 F.2d 319, 324 (5th Cir.1988)).

Turning to the first the factor, the place of contracting, is the state where it is delivered. *Hammersmith*, 480 F.3d at 233. Oneida Plaza contends that the contract was delivered to Chealan Tav at her home address in Pennsylvania, whereas Ohio Security asserts that the state of delivery is unknown. Despite Oneida Plaza's contention, there is no evidence in the record to support that the contract was delivered to Chealan Tav in Pennsylvania.[7] Rather, the only addresses listed in the Policy for Oneida Plaza are its mailing address in Utica, New York, and its insurance agent's address in New York, New York. "Standing alone, the place of contracting

---

[6] Ohio Security is incorporated in New Hampshire and has its principal place of business in Massachusetts. Def.'s SUF ¶ 9. Because neither party contends that New Hampshire or Massachusetts late notice laws should apply, the § 188 analysis will not focus on any contacts with either of these states.

[7] Oneida Plaza relies on the verified Complaint for support that the Policy was delivered to Chealan Tav in Pennsylvania. The Complaint, however, only states that "while in Philadelphia, Pennsylvania, plaintiff . . . obtained a policy of insurance." Compl. ¶ 3. The Complaint does not state where or to whom the Policy was delivered.

10

is a relatively insignificant contact." Restatement (Second) of Conflict of Laws § 188 cmt. e. In this case, because it is unclear where the Policy was delivered, this factor has no significance.

The second factor, the place of negotiation, is where the parties negotiated and agreed on the terms of the contract. *Id.* Oneida Plaza argues that this factor is neutral because there is no information in the record as to where negotiations occurred. Ohio Security argues that even though it is unknown where negotiations actually took place, this factor weighs in favor of New York because Oneida Plaza's insurance broker was located in New York.

In *Hammersmith*, the Third Circuit faced a similar question, in deciding whether negotiations for an insurance policy occurred in New York or Pennsylvania. 480 F.3d at 234. Because there was no evidence that any negotiations took place in Pennsylvania, the Third Circuit determined that the place of negotiation was New York in view of the fact that the insured's insurance broker and the wholesale broker were both located in New York, and application materials and some policy revisions were prepared in New York. *Id.* Based on the very limited information available, that Oneida Plaza's insurance broker was located in New York, this factor weighs somewhat in favor of New York.

The third factor, the place of performance, is the state in which notice should have been provided.[8] *Id.* The Policy's New York Changes Endorsement directs the insured to provide notice of loss "to any of our agents in New York State." Watson Decl. Ex. A. Because notice should have been provided in New York, this factor weighs in favor of New York.

As for the fourth factor, the location of the insured risk, both parties agree that the Property was located in New York and this factor indisputably favors New York.

---

[8] The place of performance is also where the premiums are received. *Hammersmith*, 480 F.3d at 234 n.13. Here, the premiums were to be received in Massachusetts, the principal place of business for Ohio Security. Because neither party contends that Massachusetts law should govern this dispute, the place the premiums are received is irrelevant.

11

The final factor takes into consideration "the domicil[e], residence, nationality, place of incorporation and place of business of the parties." Restatement (Second) of Conflict of Laws § 188(2)(e). "[T]he significance of the parties' domiciles 'depends largely upon the issue involved and upon the extent to which they are grouped with other contacts.'" *Hammersmith*, 480 F.3d at 235 (quoting Restatement (Second) of Conflict of Laws § 188 cmt. e).

The only connection to Pennsylvania is that the owners of Oneida Plaza were domiciled in Pennsylvania during the Policy period and at the initiation of the lawsuit. Since then, however, Chealan Tav has relocated to New York. More importantly, however, Oneida Plaza is a New York limited liability company with a New York mailing address that owns a Property located in New York. The Pennsylvania domicile of the owners is insignificant in comparison to the many connections Oneida Plaza has to New York. This factor weighs somewhat in favor of New York.

Weighing the contacts on a qualitative scale, New York has a more significant relationship to the Policy and this action than Pennsylvania. Additionally, New York has the greater policy interest because the Policy insures a Property located in New York, the insured's broker is in New York, and the insured is a New York LLC with a New York mailing address. Because New York has the greater interest in the application of its law, New York law applies to the late notice provision.

### B. New York Law on Late Notice

Under New York law, if an insurance policy requires timely notice of an occurrence, compliance with the notice provision operates as a condition precedent to an insurer's liability under the contract. *Hammersmith*, 480 F.3d at 236; *Sec. Mut.*, 293 N.E.2d at 78. Absent a valid excuse, the failure of an insured to give timely notice to the insurance company relieves an

insurer of its obligation to provide coverage, regardless of whether the insurer was prejudiced by the delay. *Hammersmith*, 480 F.3d at 236; *Sec. Mut.*, 293 N.E.2d at 78.

When an insurance policy requires "prompt" notice, an insured must provide notice within a reasonable period of time under the circumstances. *Green Door Realty Corp. v. TIG Ins. Co.*, 329 F.3d 282, 284, 287 (2d Cir. 2003); *Ticheli v. Travelers Ins. Co.*, No. 1:14-CV-00172, 2015 WL 12734163, at *4 (N.D.N.Y. Mar. 14, 2015). "In some cases, even short delays will render a notice untimely." *Olin Corp. v. Ins. Co. of N. Am.*, 966 F.2d 718, 723 (2d Cir. 1992) (citing two state cases where delays of fifty-one days and twenty-two days were considered unreasonable). On many occasions, courts have held under New York law that a relatively short period of delay is unreasonable as a matter of law and discharged an insurer's obligation to provide coverage. *See, e.g., Am. Home Assur. Co. v. Republic Ins. Co.*, 984 F.2d 76, 78 (2d Cir. 1993) (36 days); *Utica Mut. Ins. Co. v. Fireman's Fund Ins. Companies,* 748 F.2d 118, 123 (2d Cir. 1984) (5 months); *Heydt Contracting Corp. v. Am. Home Assur. Co.*, 536 N.Y.S.2d 770, 772 (N.Y. App. Div. 1989) (in excess of 4 months); *Power Auth. v. Westinghouse Elec. Corp.*, N.Y.S.2d 420, 423 (N.Y. App. Div. 1986) (53 days)).

"The test for determining whether the notice provision has been triggered is whether the circumstances known to the insured at that time would have suggested to a reasonable person the possibility of a claim." *Sparacino v. Pawtucket Mut. Ins. Co.*, 50 F.3d 141, 143 (2d Cir. 1995). A failure to give timely notice to an insured may be excused if the insured either lacked knowledge of the occurrence or had a reasonable belief of nonliability. *Sec. Mut.*, 293 N.E.2d at 78-79; *Com. Union Ins. Co. v. Int'l Flavors & Fragrances, Inc.*, 822 F.2d 267, 271 (2d Cir. 1987). The insured bears the burden of proving that a valid excuse exists for the failure to give timely notice. *Sec. Mut.*, 293 N.E.2d at 79. "Generally, the question of whether a delay is excusable is a

question of fact for the jury, but of course a delay may be unreasonable as a matter of law when either no excuse is advanced or a proffered excuse is meritless." *Olin*, 966 F.2d at 724 (citing *Public Serv. Mut. Ins. Co. v. Levy*, 387 N.Y.S.2d 962, 965 (N.Y. Sup. Ct. 1976), *aff'd*, 395 N.Y.S.2d 1 (N.Y. 1977)).

Ohio Security argues that it owes no obligation to provide coverage to Oneida Plaza as a matter of law because Oneida Plaza did not promptly provide notice of the storm damage to Ohio Security as required by the Policy. Specifically, Ohio Security argues that Oneida Plaza's failure to provide notice of the storm damage for more than eight months is inexcusable and vitiated Ohio Security's liability under the Policy. Oneida Plaza argues that its delayed notice is excusable because it was not aware of the "true damage" to the Property until April 2022. Pl.'s Resp. 16. Because the Fire Marshal declared the building unsafe on August 13, 2019, the day of the storm, and prohibited the owners from entering the building until after the roof was replaced, Oneida Plaza argues that it was unable to enter the building and learn of the damage caused by the storm until after the roof was replaced in April 2022.

"The test for determining whether the notice provision has been triggered is whether the circumstances known to the insured at that time would have suggested to a reasonable person the possibility of a claim." *Sparacino v. Pawtucket Mut. Ins. Co.*, 50 F.3d 141, 143 (2d Cir. 1995). Therefore, once an insured becomes aware of "the mere possibility of a claim," it should also be aware of its duty to promptly inform its insurer of the occurrence. *Heydt*, 536 N.Y.S.2d at 773. "[A]n insured may not avoid giving notice during the period that the exact amount of the loss is established or the details are clarified." *Utica Mut. Ins. Co. v. Fireman's Fund Ins. Companies*, 748 F.2d 118, 122 n.4 (2d Cir. 1984).

Based on the circumstances known to Oneida Plaza, it should have been aware of the possibility of a claim on August 13, 2019, when two owners of Oneida Plaza, Chelan and Lilin Tav, witnessed the storm occurring while they were at the Property. During the storm, Chealan and Lilin Tav noticed that spots in the roof were leaking. Lilin Tav also saw some of the roof come down and observed debris from the roof on the ground. These observations alone should have been enough to apprise Oneida Plaza of "the mere possibility of a claim" and to trigger its duty to promptly provide notice to Ohio Security.

In addition to these observations, several additional events occurred within a month after the storm that clearly triggered Oneida Plaza's duty to provide prompt notice to Ohio Security. Almost immediately after the storm, Chealan Tav learned that the building had been declared unsafe due to structural deficiencies and she was informed by someone in the Fire Marshal's office that no repair work could be done inside the building until the roof was replaced. Because Oneida Plaza was aware of the need for a new roof it began to search for a company to replace the roof. Finally, on September 9, 2019, less than a month after the storm, Oneida Plaza received a proposal from Dennis Padula & Sons for a total roof replacement.

Despite learning from both the Fire Marshal's office and Dennis Padula & Sons that the roof of property needed to be replaced, Oneida Plaza argues that it was unaware of the "true damage" caused by the storm because no one was allowed to enter the building and assess the interior damage. When Oneida Plaza finally filed its insurance claim, it sought coverage for the expenses associated with replacing the roof and repairing the interior. As soon as Chelan Tav and Lilin Tav observed that the roof was damaged and water was leaking into the building, Oneida Plaza should have been aware of the possibility of the need to file a claim to replace the roof and repair the interior. It is indisputable that Oneida Plaza had a duty to provide prompt notice to

Ohio Security of the possibility of a claim, once it learned from both the Fire Marshal and Dennis Padula & Sons that the roof needed replacement.

Rather than immediately notifying Ohio Security of the possibility of a claim, Oneida Plaza delayed eight months until after the roof was replaced in April 2022 to file a claim. Oneida Plaza's decision to delay providing notice to Ohio Security until after it could enter the building and learn the exact amount of loss is inexcusable. "[A]n insured may not avoid giving notice during the period that the exact amount of the loss is established or the details are clarified." *Utica*, 748 F.2d at 122 n.4. By waiting more than eight months to provide Ohio Security with notice of the damage, Oneida Plaza failed to provide Ohio Security with the prompt notice required by the Policy. Because this period of delay is unreasonable as a matter of law, Ohio Security has no obligation to provide coverage to Oneida Plaza. Therefore, I will grant Ohio Security's motion for summary judgment.

                                                 _s/ANITA B. BRODY, J._
                                                 ANITA B. BRODY, J.